# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 13, 2007

Charles R. Fulbruge III
Clerk

No. 07-40487

In The Matter Of: SCOTIA PACIFIC COMPANY LLC

Debtor

_____

AD HOC GROUP OF TIMBER NOTEHOLDERS

Appellant

v.

THE PACIFIC LUMBER CO.; SCOTIA PACIFIC COMPANY LLC

Appellees

Appeal from the United States District Court
for the Southern District of Texas

No. 07-40487

Before DAVIS, BARKSDALE, and PRADO, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This is an appeal from a bankruptcy court order which was certified to this Court pursuant to 28 U.S.C. § 158(d)(2). Appellant challenges the bankruptcy court's holding that Scotia Pacific Company LLC ("Scopac") was not a "single asset real estate" ("SARE") debtor under § 101(51B) of the Bankruptcy Code and was therefore not subject to expedited reorganization procedures set forth in § 362(d)(3) of the Code. We affirm.

I.

A.

Scopac is a limited liability company which was formed as a "special purpose" subsidiary of Pacific Lumber Company ("Palco"). Palco transferred to Scopac approximately 200,000 acres of timberlands in Humboldt County in Northern California as well as the contractual right to harvest timber on an additional 10,500 acres owned by its affiliates. Scopac's business is to derive maximum revenue from the timber grown on these lands ("Scopac Timber") while maintaining sustainable forests. Scopac plans, manages, and implements Timber Harvesting Plans relating to the Scopac Timber. It also conducts the sale of the standing timber and then re-plants and manages future timber stands. Additionally, Scopac attends to the varying harvesting requirements and environmental prescriptions of each of the nine watersheds on the Scopac land.[1] However, Palco harvests the timber from the timberland.

Scopac currently has over sixty employees, the majority of whom are scientists employed within the forestry program. The bankruptcy court's order contains detailed findings of fact regarding Scopac's operations and the activities

---

[1] A watershed is an area of land draining into a stream. Each watershed is a distinct area with unique characteristics that require the application of watershed-specific forestry management techniques.

2

of its employees. The following is a summary description of the specialized work done by the Scopac employees. Scopac performs timberlands analysis and inventory through its own employees and outside contractors. It also ensures compliance with various laws and rules including its habitat conservation plan, the California Forest Practice Rules, and the Clean Water and Porter-Cologne Acts. Scopac also develops a Timber Harvesting Plan, submits it for approval, and implements the Plan. This includes road planning, design, and engineering. Scopac also supervises harvesting by Palco personnel to ensure compliance with the Timber Harvesting Plan and applicable regulations. Additionally, Scopac prepares and submits permit applications including those regarding water quality, Erosion Control Plan development and implementation, and a Streambed Alteration Agreement. Further, Scopac is involved in individual programs in a variety of specialized fields such as watershed analysis and other scientific studies as well as litigation support. After harvesting by Palco, Scopac performs post-harvest site preparation, replanting, vegetation management efforts, and streambed remediation.

Scopac borrowed funds in the capital markets from investors in the amount of $867 million to fund its business. The Timber Notes Scopac executed are senior secured obligations of Scopac and are secured by the land and the income generated through the harvesting and sale of timber.

B.

Scopac (and several affiliated companies) filed a Chapter 11 bankruptcy petition to avoid foreclosure proceedings by the indenture trustee of the Timber Notes. The Ad Hoc Group of Timber Noteholders ("Noteholders") moved the bankruptcy court to expedite the bankruptcy proceedings pursuant to §

362(d)(3)[2] of the Bankruptcy Code arguing that Scopac is a SARE debtor. The bankruptcy court denied the Noteholders' motion.

The bankruptcy court made extensive factual findings and concluded that Scopac does not meet the definition of SARE set forth in § 101(51B) of the Bankruptcy Code. The court concluded that because Scopac operates substantial business on the property, it is not a SARE:

> Scopac is also engaged in a "substantial business" other than operating the real property. This Court agrees with Judge Rhoades' interpretation [in In re Club Golf Partners, L.P.] of the definition "according to an active-versus-passive criterion that inquires into the nature of revenue generation on and by the property, that is, whether the revenue is the product of entrepreneurial, active labor and effort — and thus is not single asset real estate — or is simply and passively received as investment income by the debtor as the property's owner — and thus is single asset real estate . . . . Real property that, for the generation of revenues, requires the active, day-to-day employment of workers and managers other than or additional to the principals of the debtor, and that would not generate substantial revenue without such labor and efforts, should not be regarded as single asset real estate."

In re Scotia Dev., L.L.C., No. 07-20027, 2007 WL 2727130, at *12 (Bankr. S.D. Tex. Apr. 5, 2007) (quoting In re Club Golf Partners L.P., No. 07-40096-BTR-11,

---

[2] Section 362(d)(3) provides: "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90–day period) or 30 days after the court determines that the debtor in subject to this paragraph, whichever is later — (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or (B) the debtor has commenced monthly payments that — (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate . . . ." 11 U.S.C. § 362(d).

2007 WL 1176010, at *4 (E.D. Tex. Feb. 15, 2007)). Thus, the bankruptcy court concluded: "Scopac is clearly engaged in an active economic enterprise on its . . . property." Id. at *9.[3]

The Noteholders appealed the order to the district court and moved the bankruptcy court to certify the appeal to this Court pursuant to 28 U.S.C. § 158(d)(2). The bankruptcy court initially denied certification of the appeal but three days later entered an order vacating the order denying certification and recommended that the district court certify the appeal. The district court then entered an order certifying the appeal to this Court. In response to the district court's certification order, we accepted this appeal.

Two issues are presented in this appeal. First, whether this Court should exercise appellate jurisdiction in this case notwithstanding the fact that the case was certified to this Court by the district court while it was still technically pending before the bankruptcy court; second, whether Scopac is a SARE. We consider these issues below.

## II.

This Court applies the same standard in reviewing decisions of a bankruptcy court as does the district court. Nesco Acceptance Corp. v. Jay (In re Jay), 432 F.3d 323, 325 (5th Cir. 2005). "A bankruptcy court's findings of fact are reviewed for clear error and its conclusions of law de novo." Id. "This Court may affirm if there are any grounds in the record to support the judgment, even if those grounds were not relied upon by the courts below." Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.), 440 F.3d 238, 245 (5th Cir. 2006) (internal quotations omitted).

## III.

---

[3] The bankruptcy court held that Scopac did not meet any of the three prongs of the test in § 101(51B); however, because we only reach the third prong — whether Scopac conducts substantial business other than operating the real property — we refer only to the bankruptcy court's analysis on this point.

A.

Scopac argues first that this Court should not entertain this appeal because the case was not certified to this Court in accordance with the applicable rules. More particularly, Scopac contends that because the appeal was pending in the bankruptcy court when the district court certified it, the wrong court certified it for appeal, and consequently we should not consider the appeal.

The certification of bankruptcy cases for appeal from the bankruptcy court to the Court of Appeals under § 158 is a new procedure added by the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") in 2005.[4] The procedure to be followed in such certification is supplied by Interim Federal Rule of Bankruptcy Procedure 8001(f) (which has been adopted by the Southern District of Texas) which provides that a bankruptcy court shall make the certification while the matter is pending in the bankruptcy court. FED. R. BANKR. P. 8001(f) [Interim].[5] It is uncontested that when the district court certified this case for appeal it had not yet been docketed in the district court and therefore was still "pending" in the bankruptcy court according to Interim

---

[4] 28 U.S.C. § 158(d)(2)(A) provides: "The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved . . . certif[ies] that — (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States . . . and if the court of appeals authorizes the direct appeal of the judgment, order, or decree." 28 U.S.C. § 158. Subsection (a) mentioned within (d)(2)(A) pertinently provides for jurisdiction to hear appeals from final judgments, orders, and decrees. Id.

[5] Interim Federal Rule of Bankruptcy Procedure 8001(f) pertinently provides: "A certification that a circumstance specified in 28 U.S.C. § 158(d)(2)(A)(i)–(iii) exists shall be filed in the court in which a matter is pending for purposes of 28 U.S.C. § 158(d)(2) and this rule. A matter is pending in a bankruptcy court until the docketing, in accordance with Rule 8007(b), of an appeal taken under 28 U.S.C. § 158(a)(1) or (2), or the grant of leave to appeal under 28 U.S.C. § 158(a)(3). A matter is pending in a district court or bankruptcy appellate panel after the docketing, in accordance with Rule 8007(b), of an appeal taken under 28 U.S.C. § 158(a)(1) or (2), or the grant of leave to appeal under 28 U.S.C. § 158(a)(3). (A) . . . (i) . . . Only a bankruptcy court may make a certification on request or on its own initiative while the matter is pending in the bankruptcy court. " FED. R. BANKR. P. 8001(f)(2) [Interim].

Rule 8001(f)(2). Thus, it is clear that the proper court to certify the appeal from the bankruptcy court judgment was the bankruptcy court rather than the district court.

Because the procedure for certification of judgments in bankruptcy cases is a court-promulgated rule and not governed by statute, certification by the district court in this case did not deprive this Court of jurisdiction. See Bowles v. Russell, 127 S. Ct. 2360, 2364-65 (2007). The Supreme Court in Bowles, in considering the effect of a violation of procedural rules which were adopted by a court rather than by statute, stated: "On the other hand, we have treated the rule-based time limit for criminal cases differently, stating that it may be waived because '[t]he procedural rules adopted by the Court for the orderly transaction of its business are not jurisdictional and can be relaxed by the Court in the exercise of its discretion . . . .'" Id. at 2365. See also Kontrick v. Ryan, 540 U.S. 443, 453 (2004) (Bankruptcy Rules adopted by the court for the orderly transaction of its business are not jurisdictional).

Scopac does not argue that the certification of this case by the district court rather than the bankruptcy court deprives us of jurisdiction, and we agree with Noteholders that this procedural glitch does not deprive us of jurisdiction. The only question is whether we should consider the merits of this appeal despite the procedural mistake.

The record makes it clear in this case that both the bankruptcy court and the district court sought to certify the bankruptcy court judgment to this Court for appeal. After the bankruptcy court judgment was appealed to the district court, the bankruptcy court recommended certification to the district court. The fact that the bankruptcy court and the district court overlooked the fact that the case was still technically pending in the bankruptcy court under Interim Bankruptcy Rule 8001(f)(2) apparently prompted the district court to certify the judgment for appeal. Under these circumstances, where both courts wish to

certify the case to this Court for appeal, this error is technical in nature, does not affect the substantial rights of the parties, and prompts us to exercise our discretion in favor of proceeding to the merits of this appeal.

B.

Turning to the merits, the Noteholders argue that the bankruptcy court erred in concluding that Scopac was not a SARE. In determining whether Scopac is a SARE, we turn first to the statutory definition in § 101(51B) of the Bankruptcy Code:

> The term "single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental.

11 U.S.C. § 101(51B) (2006). Three requirements emerge from this definition which must all be met for a debtor to be considered a SARE debtor: (1) the debtor must have real property constituting a single property or project (other than residential real property with fewer than 4 residential units), (2) which generates substantially all of the gross income of the debtor, and (3) on which no substantial business is conducted other than the business of operating the real property and activities incidental thereto. If a debtor fails to meet any prong, it is not a SARE.

The Noteholders argue that Scopac should be considered a SARE because it meets all three prongs of § 101(51B) of the Bankruptcy Code. Scopac argues that it does not qualify as a SARE under any of the § 101(51B) prongs. We find it unnecessary to consider whether Scopac qualifies under the first two prongs because we conclude that it clearly does not qualify under the third prong — it conducts substantial business other than operation of the real estate.

1.

The term "SARE" was added to the Bankruptcy Code in 1994. See In re Kkemko, Inc., 181 B.R. 47, 49 (Bankr. S.D. Ohio 1995). Courts that have considered whether a debtor is a SARE under the 1994 amendment to the Bankruptcy Code have examined various types of businesses in the context of whether they conduct substantial business other than operating the real property. The most frequently cited case for the discussion of this issue is In re Kkemko. Id. The bankruptcy court in that case considered whether a debtor that operated a marina was a SARE. Id. at 48–49. The court explained that "the business of the marina is something more than simply rental of moorings. It stores, repairs, and winterizes boats." Id. at 51. The marina also provides showers as well as activities for those using the marina, and it sells gas and other amenities. Id. The court held that these diverse activities supported the conclusion that the debtor's marina did not come within the definition of SARE. Id.

In a recent case, In re Club Golf Partners, L.P., the Eastern District of Texas held that a golf club which conducted substantial business other than operating the real property was not a SARE. 2007 WL 1176010, at *6. The court explained that "in the years between 1994 and 2005, bankruptcy courts . . . took a practical view of the concept [of single asset real estate] in their interpretations of § 101(51B), including within its ambit only those debtors who have no revenue from their property except the passive collection of rent from tenants and excluding from its reach those entities that undertake and pursue various sorts of active economic, commercial, and business activities on the property." Id. at *2.[6] Further:

---

[6] See also Kara Homes, Inc. v. National City Bank, et al. (In re Kara Homes Inc.), 363 B.R. 399, 405–06 (Bankr. D.N.J. 2007) (citing In re Whispering Pines Estate, Inc., 341 B.R. 134 (Bankr. D.N.H. 2006); In re Prairie Hills Golf & Ski Club, Inc., 255 B.R. 228 (Bankr. D. Neb. 2000); Banc of America Commercial Finance Corp. v. CGE Chattuck, L.L.C. (In re CGE Shattuck L.L.C.), Nos. 99-12287-JMD, CM 99-747, 1999 WL 33457789 (Bankr. D.N.H. 1999);

> In order to be single asset real estate, the revenues received by the owner must be passive in nature; the owner must not be conducting any active business, other than merely operating the real property and activities incidental thereto. Under the prior jurisprudence, those passive types of activities are the mere receipt of rent and truly incidental activities such as arranging for maintenance or perhaps some marketing activity, or . . . mowing the grass and waiting for the market to turn.

Id. at *5 (internal quotations omitted). The court explained that the debtor golf club was not a SARE because in addition to owning real estate, it also operated a variety of revenue-producing activities. Id. at *6. These included the debtor's employment of third-party employees, the sale of memberships, the charging of fees for access to the golf course and other amenities, and the sale of merchandise, food, and beverages in its pro shop and restaurant. Id.

> Because its business activities are variegated and multiple and are dependent on the entrepreneurial efforts and ongoing hard work of its principals and its other employees, and because it does not simply lease its property to tenants as the owner of true single asset real estate such as an apartment house does, the Debtor's golf course does not fall within the scope of the definition of single asset real estate . . . .

Id. (internal quotations omitted).

In In re Prairie Hills Golf & Ski Club, Inc., a bankruptcy court held that the debtor, an operator of a golf and ski club, was not a SARE because it conducted substantial business on the property. 255 B.R. at 230. The court explained that the debtor does not simply "hold a passive real-estate investment" and "does not merely own income-producing buildings and raw land. Rather, it is involved in other significant income-producing activities." Id. These activities included building and maintaining roads on the land, developing the golf and ski

---

In re Larry Goodwin Golf, Inc., 219 B.R. 391 (Bankr. M.D.N.C. 1997); Centofante v. CBJ Dev., Inc. (In re CBJ Dev. Inc.), 202 B.R. 467 (B.A.P. 9th Cir. 1996)).

areas, and operating the farmland on the property. Id. See also Commerce Bank and Trust Co. v. Perry Hollow Golf Club, Inc. (In re Perry Hollow Mgmt., Co.), Nos. 99-13373-MWV, CM 00-127, 2000 WL 33679447, at *2 (Bankr. D.N.H. 2000) ("[R]unning a golf course is a substantial business other than the operation of the real property itself" which includes the operation of a pro shop, a food and beverage operation, rental of carts, collection of fees, and maintenance of a labor force.); In re CGE Shattuck, 1999 WL 33457789, at *7 (business of a golf course including pro shop, golf cart rentals, and other golf-related services constituted substantial business other than operation of the real property); In re Larry Goodwin Golf, Inc., 219 B.R. at 393 (golf course which rents golf carts, has a pool, provides concessions, and owns adjacent land for sale conducts substantial business other than operating the real estate).

The Ninth Circuit Bankruptcy Appellate Panel in In re CBJ Development held that a hotel was not a SARE because it conducted substantial business other than operation of the real estate. 202 B.R. at 473–74. The court concluded that the operation of a hotel — including employment of a substantial number of people to clean rooms, sheets, and towels and to provide services — requires "substantially more day to day activity than does the operation of an apartment complex. Accordingly, the operation of the Hotel is sufficiently active in nature to constitute a business other than the mere operation of property." Id. at 472. See also In re Whispering Pines, Inc., 341 B.R. at 136 (a full service hotel with eighty-nine rooms, cleaning and laundry services, and other guest amenities is not a SARE because it conducts substantial business other than operating the real estate); but see In re 5877 Poplar, L.P., 268 B.R. 140, 142, 144 (Bankr. W.D. Tenn. 2001) (assuming that debtor who owned, operated, and collected rents from a 126-unit Comfort Inn is a SARE).

The Noteholders contend that this Court should find that Scopac is not a SARE based on a recent bankruptcy court case from New Jersey: In re Kara

11

Homes, Inc., 363 B.R. 399. In that case, the debtor owned real estate and was engaged in the construction and sale of single-family homes and condominiums. Id. at 400–01. The court considered the activities of the debtor to determine whether the business operations were sufficiently active such that the debtor should not be deemed a SARE. Id. at 405–07. The debtor's business included the acquisition of land, the design of homes and condominiums for that land, arranging for the construction of homes, the marketing and sale of homes, and finally, the building of a common space, amenities, and roadways. Id. at 402. The court explained that a business would not be a SARE if "a reasonable and prudent business person would expect to generate substantial revenues from the operation activities — separate and apart from the sale or lease of the underlying real estate." Id. at 406 (emphasis added). In Kara Homes, the court found that the debtor was a SARE because the debtor's activities "reflective of business operations [we]re merely incidental to [its] efforts to sell the[] homes or condominium[s]" and thus did not constitute substantial business. Id. (internal quotations omitted). "In order to build and sell homes, it is often necessary to acquire the land on which to build the homes, and plan the community in which they lie; likewise, it is necessary to market those homes for sale and maintain the properties." Id. The Noteholders contend that the activities in Kara Homes are very similar to Scopac's, and thus Scopac should be deemed a SARE. We disagree. The construction and sale of homes (and the land on which they are built) is within the traditional scope of the SARE definition, and the sale of homes includes the sale of the real estate. Scopac, on the other hand, performs its business on the real estate for the purpose of selling timber — not the underlying real estate. Thus we find the Noteholders' reliance on Kara Homes unpersuasive.

The above discussed cases are representative of those discussing the third prong of the SARE definition: what constitutes substantial business other than

12

operating the real estate. The record in the case demonstrates that Scopac's business activities discussed above are much more extensive and diverse than the activities of golf clubs, marinas, and hotels considered in the above cases.[7]

2.

Scopac also points out that although § 101(51B) added the term SARE as a statutory term in 1994, the term already had a well established meaning in the bankruptcy jurisprudence. Scopac argues that the pre-1994 meaning attached to this term is helpful in interpreting its statutory meaning. Several post-1994 cases agree. See, e.g., In re Kkemko, 181 B.R. at 50. These cases point out that before 1994, courts recognized that SARE debtors more often than debtors generally, filed abusive Chapter 11 petitions to stave off creditors when they had no hope of reorganizing. One such case from this Circuit explained generally how we defined such debtors before the introduction of the statutory definition and why these debtors deserved special attention to prevent abusive petitions:

> The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments . . . . Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court.

---

[7] The meaning attached to the statutory term SARE is consistent with the legislative history of the 1994 Act. The legislative history of the 1994 inclusion of SARE in the Bankruptcy Code indicates that SARE refers to property held for passive investment — not property used in an active business enterprise. "We commonly think of a single asset case as one of a debtor with a single apartment house or condo complex or a single piece of real estate. However, this could include a debtor . . . such as a real estate investment trust. . . ." 138 Cong. Rec. S8241-01, *S8264 (daily ed. June 16, 1992) (statement of Sen. Reid). The Senate Report for the Bankruptcy Reform Act of 1994 further explains that the "definition is limited to investment property of the debtor." S. Rep. No. 168, 103rd Cong., 1st Sess. (October 28, 1993).

Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1073 (5th Cir. 1986).

We find similar reasoning in a number of cases using the pre-1994 meaning to assist in interpreting the statutory term. See, e.g., In re CBJ Dev. Co., 202 B.R. at 471 (looking to pre- 1994 cases for guidance); In re Kkemko, 181 B.R. at 50 ("[T]he Bankruptcy Reform Act of 1994 did not introduce the phrase 'single asset real estate' into bankruptcy cognizance. It is, indeed, a common term in bankruptcy, and has been used for many years in the bankruptcy area."); In re Philmont Dev. Co., 181 B.R. 220, 223 (Bankr. E.D.Pa. 1995) ("The drafters of sections 101(51B) and 362(d)(3) were aware of the colloquial use of the phrase 'single asset real estate,' and the Court believes that their intention in using that phrase grew out of its previous colloquial and common usage."). We agree with Scopac that the pre-1994 meaning of SARE is helpful in determining the meaning Congress intended to give the term.

3.

The Noteholders also rely on the 2005 BAPCPA amendments to support the argument that Scopac should be considered a SARE. In 2005, § 101(51B) was amended by BAPCPA to exclude family farmers and to remove the existing $4 million cap on businesses that could qualify as SAREs.[8]

The Noteholders' main argument on this point is that by excluding family farmers as SAREs, Congress implied that the definition included large farming operations such as Scopac's tree farming operation. To draw this inference, we

---

[8] The following redlined version of § 101(51B) shows, through underlined additions and stricken-through deletions, the changes made by the 2005 amendment: "The term single asset real estate means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental ~~thereto having aggregate noncontingent, liquidated secured debts in amount no more than $4,000,000.~~"

14

would presumably need to accept that Congress by excluding family farmers intended to include other farms regardless of size and regardless of the extent and diversity of their active operations. We are unable to accept the notion that Congress intended to adopt one model for SAREs that applies only to farms and another to all other types of businesses. It is much more reasonable to assume that Congress sought to avoid a conflict with Chapter 12 of the Bankruptcy Code.

The Noteholders also point to the removal of the $4 million cap and argue that this makes it clear that Congress intended to include large enterprises within the scope of the SARE definition. However, including large enterprises does not mean Congress intended to otherwise abandon the statutory definition of SARE or overrule the established court interpretations of the term. We find no merit to this argument.

## IV.

We agree with the bankruptcy court's holding that Scopac conducts substantial business other than operating the real property and activities incidental thereto. Scopac's timberland is clearly more than a passive investment. Scopac has over sixty employees and at times hires additional independent contractors to assist in conducting its business. Sophisticated operations take place on the timberland such as planning, growing, and maintaining the timber as well as building and maintenance of roads on the real estate which constitute substantial business other than the operation of the real property and activities incidental thereto. Furthermore, Scopac's sale of timber is an activity which extends beyond the sale or lease of the underlying land.[9]

---

[9] The sale of Scopac timber to Palco is not a sale of the real estate itself. None of the SARE cases have held a sale of timber to be a sale of the real estate itself. Further, under the California Civil Code, timber, as appurtenant to the land, would be considered part of the real property unless "for the purposes of sale, emblements, industrial growing crops and things attached to or forming part of the land, which are agreed to be severed before sale or under the contract of sale, shall be treated as goods . . . ." Cal. Civil Code § 658; see also Cal. Comm. Code

We are also convinced that a holding that Scopac is a SARE would violate the plain language of the statute and is inconsistent with the meaning (both pre- and post-1994) given that term by the courts. Section 101(51B) severely limits the class of debtors which qualify as SAREs, and we have no warrant to expand that definition. SARE debtors are carved out and subjected to stringent requirements in § 362(d)(3) which expedite the time for SARE debtors to file a plan of reorganization or commence making monthly payments, failing which the automatic stay is promptly lifted. See 11 U.S.C. § 362(d)(3). If Scopac is considered a SARE debtor, this narrow exception to the ordinary bankruptcy process would sweep broadly and require us to include such entities as owners of land or mineral interests who operate sophisticated businesses such as mining, oil and gas drilling, and large commercial farms simply by virtue of the debtor owning the land. Such a result is obviously contrary to the plain language of §101(51B).

For the above reasons, we agree with the bankruptcy court that Scopac is not a SARE debtor and affirm its judgment.

AFFIRMED.

---

§ 2107 ("A contract for the sale apart from the land of . . . timber to be cut is a contract for the sale of goods within this division whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance."). We are therefore unpersuaded that "real estate" for the purposes of bankruptcy law would include this timber contracted for sale to Palco. See In re Kkemko, Inc., 181 B.R. at 51 ("[I]t is clear to us that it is bankruptcy law which is determinative . . . not a consideration of what is real estate for purposes of state real estate law.").